## Sandy Valley & Elkhorn Railway Company v. Bridgman.

### (Decided February 1, 1916.)

### Appeal from Pike Circuit Court.

1. Master and Servant—Relation Exists When Servant is Going to and from His Work.—When the servant is using premises of the master set apart for his use in going to and from his home or boarding place and his work, he will be treated as in the employment of the master while so using said premises, and the duty will be imposed upon the master of furnishing him a reasonably safe place.

2. Master and Servant—Servant Going to and from Work—Duty of Master.—To hold the master liable in this class of cases it must appear that he furnished or set apart for the use of his employes the way or the means, which ever was used, and the injury must have been caused by some defect in the way or means, or caused by the negligence of some servant of the master acting at the time under his direction or within the scope of his employment. So that if a railroad company has furnished or set apart a hand car for the transportation of its laborers, and one of the employes is injured by the unsafe condition of the track or a defect in the hand car, the company will be liable for the injury; and so if he is injured by any servant or agent of the company acting under its direction or within the scope of his employment, the company will be liable.

3. Master and Servant—Servant Going to and from Work—When Master Not Liable.—Where a railroad company furnished a hand car for the convenience of its employes in going to and from the work and their homes, and one of the employes was injured while on the car by the negligence of a co-employe also on the

car, the company was not liable, as the co-employe was not acting for it and the injury was not due to any defect in the place or appliances it had furnished.

AUXIER, HARMAN & FRANCIS and HAGER & STEWART for appellant.

ROSCOE VANOVER and E. J. PICKLESIMER for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

In this action by the appellee Bridgman against the appellant company to recover damages for personal injuries, the petition, after stating that the company as well as the employe at the time of the accident were engaged in interstate commerce, charged that on the 25th day of July, 1912, Bridgman was in the employment of the appellant company in the repair and construction of the tracks, and ''that the agents, servants and employes superior in authority to him directed him to ride on a hand-car run along defendant's said road in returning from his work, and while said hand-car was being so run and propelled at an excessive rate of speed, the agents, servants and employes of defendant superior in authority to plaintiff carelessly and negligently placed his foot upon the brake of said hand-car without any notice or warning to plaintiff that same would be done, and by placing his foot on the brake of said hand-car, gave said hand-car a sudden jerk, which threw plaintiff from and in front of said hand-car, which ran against and over him.''

The answer denied that either the company or the plaintiff was engaged in interstate commerce, and although admitting that on the day of the accident the plaintiff was in the employment of the company, engaged in the construction of its track, it denied that he was in the line of his duty under his employment at the time plaintiff got on the car, or that the agents, servants or employes of the company superior in authority to him directed him to ride on the hand-car or directed him to ride at all, or that a superior servant of the company in charge of the car was running or operating the car at an excessive rate of speed or at all.

It further denied that any agent, servant or employe of the company superior in authority to the plaintiff, or any agent, servant or employe whatever of the company, carelessly or negligently, or at all, placed his foot upon

the brake of the hand-car without notice or warning to plaintiff that the same would be done, or at all, or thereby, or at all, gave the car a sudden jerk, or threw the plaintiff from or in front of said car, or caused the car to run over or against him.

Other paragraphs of the answer set up other defenses, but in the view we have of the case it is not necessary to refer to these other defenses, nor do we regard it as material whether the company and Bridgman were engaged in interstate commerce at the time the accident happened. In cases like this the duty and liability of the company is the same whether it is engaged in interstate or intrastate traffic.

After the issues had been made up, there was a trial before a jury, and the evidence showing that Bridgman was thrown from the car, as we may assume, by the negligence of one Tackett, a co-employe of Bridgman who was riding on the car, followed by a verdict and judgment in favor of Bridgman for five thousand dollars.

At the conclusion of the evidence for the plaintiff, and again when all the evidence was in, the company moved the court to peremptorily instruct the jury to return to return a verdict for it, and this motion having been overruled each time, the only question that we think it necessary to consider is the correctness of these rulings of the court. Whether the motion for a directed verdict should have been sustained depends on whether Bridgman at the time he was injured was in the service of the company, and on the further question whether the negligent act of the person who caused his injury was committed by such person while in the service of the company and acting for it within the scope of his employment. In fact, we might further limit the inquiry by saying that if Tackett, whose negligence caused the injury, was not at the time of the commission of the negligent act in the service of the company and acting for it within the scope of his employment, there should be no recovery. But, although the inquiry may be so limited, we think it well enough to also consider whether Bridgman was at the time of the injury in the service of the company. The disposition of these matters turns largely upon the evidence, and to that we will now address ourselves.

Bridgman testified that on July 25, 1912, he was working for the railroad company as a laborer and engaged

in raising the track and filling under the ties; that at the time he was boarding with Marion Vanover about three or four miles from the place at which he was working and where he had been working for about four days. He was further asked and said:

"Q. What, if anything, was provided for you to go backwards and forwards from your boarding house? A. I don't understand the question. Q. How did you get from your boarding house to work? A. On a lever car. Q. What is known as a hand-car? A. Yes, sir. Q. I will ask you if that was provided for you to go on, and were you directed to go on it? A. I understand it was. Q. What happened on the 25th day of July, 1912, if anything? A. I got knocked off the lever car and it ran over me. Q. Where were you going? A. To my boarding house. Q. What time of the day was it? A. Along in the evening, not far from six o'clock. Q. Had you done your day's work? A. Yes, sir. Q. And started to your boarding house? A. Yes, sir. Q. You may tell the jury what threw you from the lever car. A. I understand Calvin Tackett put his foot on the brake without giving me any warning, and it checked the speed and threw me off. Q. Did you understand some one checked it? A. Yes, sir. Q. Did you have any warning before they checked it that it was going to be stopped? A. No, sir. Q. You say you had been working how many days? A. Four days. Q. When you went to work, how did you get there? A. I went upon the train. Q. And the train was running there? A. Yes, sir. Q. Who had directed or told you that you could ride on that hand-car going backwards and forwards to your boarding house? A. Calvin Tackett said he had the car under his control, and he told me to ride on it and go with him to the boarding house. Q. Was that the first time you had gone on the hand-car. A. No, sir. Q. How many times had you come on the hand-car before you got hurt? A. I had come twice before that time. Q. Who had it in charge then? A. Calvin Tackett. Q. What was Calvin Tackett doing. A. He was working same as I was. Q. With the same crew you were working with? A. Yes, sir. Q. And he was running a boarding house? Is that a fact? A. He was boarding some. Q. Did you board with Calvin Tackett? A. No, sir; I boarded at his sister's, above his house. Q. How far above his house? A. A little piece. Q. But you were boarding with these part-

ies down at Three Mile, were you not? A. Yes, sir. Q. Something like three or four miles from that place? A. Yes, sir. Q. On the evening you got hurt, you were going from Shelby Gap to your boarding house? A. Yes, sir. Q. What caused you to get on the car? A. Well, Calvin Tackett told me to get on it. He told me he would let me ride on it. Q. Did you ask him to let you ride on it? A. I asked him. Q. What did you say? A. I asked him would he let me ride to Three Mile on the hand-car, and he said, 'Yes, sir.' Q. Were all the men that were on the hand-car working for the railroad company? A. I don't know about that, but I suppose they were. Q. Did they all board at Calvin Tackett's and his sister's? A. I don't know whereabouts they all boarded. To the best of my knowledge there was four at Calvin's sister's house, and I don't know how many at Calvin's.''

Calvin Tackett, a witness for Bridgman, testified as follows: ''Q. In your own way, Mr. Tackett, tell the jury what happened and all about it. A. Well, we had started back to our boarding houses from work and was going down from Shelby Gap, a right smart grade, and I seen another lever car coming very close, and I put the brake on the car, and when I done this Bridgman headed over in front of the car, and it run over him. Q. How many men were on the car at that time? A. To the best of my recollection there were about fourteen. Q. Before braking that car, did you give any warning to any one that you were going to brake it? A. No, sir. Q. How far was it from your work to where you were going to the boarding house on the hand-car? A. It was about three miles and maybe more. Q. At what place did you board? A. I was at home. Q. Where was the plaintiff boarding at that time? A. He was boarding at my sister's. Q. Tell the jury how you happened to be riding on the lever car; who had it under control? A. I had it under control Q. Tell how you got it. A. I got it of Cap Johnson. Q. What was done or said between you and Johnson? How did you get the car? A. The work train had been carrying us in and out, and they quit that on the Saturday before this happened; and on Sunday I went to Mr. Johnson and told him that us boys would have to quit working; that we lived on Three Mile Creek and would have to quit work if we didn't get a hand-car to ride in and out on; and he said, 'How many?' and I said, 'About sixteen,' and he says, 'Come out in the morning and I

will let you have two cars if you will promise me you will take care of the cars and see that no one uses them only going in and out from work. Q. What position did he hold with reference to the work? A. He was superintendent of the work, to the best of my knowledge. Q. How many men were you keeping at the time Bridgman got hurt? A. Four or five; I don't remember exactly how many. Q. Bridgman was staying at your sister's? A. Yes, sir. Q. How many boarders did she have? A. There was three or four or five. Q. Where were these other men going that were on the hand-car that day? A. They were going home, most of them; some of them boarded there, and some of them lived at Three Mile. Q. And were they all working for the railroad? A. Yes, sir. Q. You were running a boarding house? A. Yes, sir; some of the boys were staying with me and paying board. Q. And you got this car to take the boarders down there and bring them back so you could board them? A. I was not doing that no more for them than for myself; I was working up there myself. Q. They had a boarding house at the place where you got on the hand-car, didn't they? A. Yes, sir. Q. And you were running in opposition to that boarding house? A. I didn't mean anything like that. Q. You were taking boarders from the place where they were working and bringing them to your boarding house? A. Yes, sir. Q. And were taking them on the hand-car? A. Yes, sir. Q. And you had been keeping boarders for how long? A. Something over a week, I expect. Q. And the same fellows had been boarding with you all week A. Yes, sir; they had. Q. And you had been taking them up and down on the hand-car all of that week? A. Yes, I had. Q. Bridgman had been going along with you? A. Yes, sir. Q. He had been boarding with your sister all that time? A. I think he had.''

Morgan Bridgman, a brother of appellee, said he was present when Tackett secured the use of the car from Johnson; and he was asked and answered the following questions: ''Q. I will ask you if you know anything about Calvin Tackett getting a lever car or a hand-car from any person, and if so, what you know about it? A. The evening the boy got hurt he went and told Johnson that they took one of his cars from him, and Johnson says, 'Calvin, you take the men on that car; you are the foreman of that car, and take them to the boarding house.' Q. How long was that after your brother was hurt? A. It

was the same evening. Q. You heard Calvin Tackett tell Johnson that they had taken one of his cars from him? A. Yes, sir. Q. What did Calvin Tackett say to him about some man having taken his car? A. He told him some one had taken his car and wanted another one, and Johnson told him to take the men on to Three Mile. Q. How did it happen you did not get on that car? A. It was crowded and they would not let me on.''

The foregoing evidence states with more fullness perhaps than is necessary every fact and circumstance needed to a full understanding of the case for Bridgman. The evidence for the company showed that neither Johnson nor any one else authorized so to do had at any time given permission to Tackett, or any one else, to use the hand-car, and that on the occasion in question the hand-car was taken without the knowledge or consent of Johnson, or any other employe of the company having control over these cars. It further shows that Johnson did not make to Tackett any of the statements attributed to him by Tackett and Morgan Bridgman.

It appears from the evidence quoted and other evidence in the record: (1) That Tackett was not a foreman or in any way superior in authority over Bridgman; that he was a common laborer, working for the company in the same grade of employment as Bridgman, and had only been employed by the company about a week before the accident; (2) that the road-bed, which had been constructed by the firm of Langhorns, had not been entirely completed, and that until about four days before the accident the men who boarded at Three Mile had been taken to and from their work by a train owned and operated by the Langhorns, and which was used in their construction work, but that for some reason not explained in the record, this train had been taken off, and after that Tackett, Bridgman and others used the hand-cars of the appellant company in going to and from their work; (3) that Tackett kept a boarding house at his residence about three miles from the work, and that the sister of Tackett, who lived near Tackett, also kept a boarding house, and that several of the laborers, including Bridgman, boarded at the house of Tackett and the house of his sister; (4) that on the day Bridgman was injured, his work as well as Tackett's work for the company had ended when the car was secured on which they were riding to the boarding houses; (5)

that Tackett told Johnson, the superintendent, that unless the men could get a hand-car on which to ride to and from their work, they would have to quit, and that Johnson let him have the car for this purpose; (6) that Bridgman as well as Tackett and the other men were using a means furnished by the company to take them to and from their work, and Bridgman was riding on the car by the permission of Tackett.

Looking now to the rules of law that should be applied in cases like this, we think they are stated as favorably to the employe in L. & N. R. R. Co. v. Walker, 162 Ky., 209, as in any case that has come under our notice, and that as the facts do not bring the case within the reach of the rules laid down in the Walker case, a recovery must be denied.

Walker was a laborer for the railroad company, and boarded in cars furnished by it, located about a mile from the place at which he worked. Sometimes the men, including Walker went to and from the boarding cars on hand-cars of the company, and at other times they walked on the track. The record further shows that a part of the track ran over a high trestle, and outside of the rails there were running-boards on which the men walked in crossing the trestle; that as Walker was walking across this trestle on his way to the boarding cars after his work was done, he was knocked from the trestle by material negligently loaded on a push-car that was being moved along the track, near which he was walking, by two employes of the company; that these employes, who had negligently loaded this push-car and were operating it when Walker was knocked off the trestle, had secured permission from the company to use it for the purpose it was being used. In holding that Walker, in going at the close of the day's work to the boarding cars on premises of the company set apart by it for that purpose, was an employe of the company, and the company was under a duty to furnish him a reasonably safe means of exit, which it failed to do, the court said:

"The employes were not only invited to, but were, in a measure, obliged by the company, to use these boarding cars, and the only convenient and practicable way to go to and from the cars and the place of work was on the track of the company where Walker was when knocked off. Furthermore, it was not only the custom of

the men to use this way, but on this particular occasion they were directed by the foreman in charge of the work to so do. * * * And so, we think, that under these circumstances, an employe such as Walker was should be treated as engaged in interstate commerce not only when actually employed at his work, but while using the premises of the company in going to and from the place set apart for him to eat and sleep and his work on the premises of the company. In other words, within the contemplation of the act, the course of his employment covered not only the time he was actually engaged at work, but the time he was engaged in going to and from his work.

"Neither is it open to doubt that the relation of master and servant, or employer and employe, in cases like this begins with the employment and continues until it is ended. For example, it is a generally recognized rule that a railroad employe, while being carried to and from his work on the cars of his employer, is to be treated as being in the employment of the company to the same extent as if actually engaged in the work for which he is employed. Accordingly, if he is injured by the negligence of the company while being thus carried to or from his work, his right of recovery is controlled by the same principles that would control if he had been injured while actually engaged at his work. * * *

"We, therefore, think there would be no doubt that if Walker, while riding on the hand-car on which he and the other men started to go, under the direction of the foreman, from his work to the boarding cars, had been injured by the negligence of the company, he would be treated as being in the employment of the company with the rights accorded to such employes. * * * The employer in a case like this owes the employe the duty of furnishing him on its premises a reasonably safe place of ingress and egress to and from his work, and this duty is neither added to nor diminished by the fact that the employe rides or walks. Whether he does one or the other, the protection afforded him is the same and the duty and liability of the employer identical. The doctrine of safe places and safe premises and safe instrumentalities in this class of cases is rested on the rule of general application that the employer is under a duty to exercise ordinary care to protect the employe from danger, not only while he is actually engaged at

his work, but while he is on the premises of the employer in going to and from his work along the way set apart by the employer for this purpose.''

It is further said, in speaking of the use of the push-car: ''This push-car was being used by the persons operating it with the consent of an authorized employe of the company, and when he consented that they might use it for the purpose indicated, the company at once undertook the duty and obligation of exercising ordinary care to see that it was so used as not to inflict injury upon other employes of the company who were exercising care for their own safety. The employe who consented to the use of the car knew the purpose for which it was going to be used and engaged that the persons who were thus given the right to use it would exercise ordinary care in its use. * * * Walker was entitled to be furnished by the company reasonably safe conduct on his way from his work to the boarding car, and this duty imposed on the company was broken by the negligence of the persons who were using, with its consent, this push-car.''

It will be observed that the liability of the company in the Walker case was put distinctly on the·ground that Walker while using premises of the company set apart by it for his use in going to and from his boarding place and his work, was injured by the negligence of the company. We do not, however, attach controlling importance to the circumstance noted in the Walker case that the boarding cars were owned and operated by the company, for we think the rule would be the same if under like circumstances they had been owned and operated by a third person. It was the fact that the company had failed to furnish him a reasonably safe place on its premises to go from his work to his boarding house, and the further fact that the place was made unsafe by the negligence of the company, that made it liable for his death. But if Walker had been thrown from the trestle by the personal negligence of a co-employe who was walking with him, the company clearly would not have been liable.

Now the material distinction between the Walker case and the case we have is this: Here Bridgman was not injured by the negligence of an employe of the company acting for it or in the scope of his employment. Tackett was using the hand-car by the consent of the

company for the convenience and accommodation of himself and the other men, and Bridgman was on the handcar by the permission of Tackett, whom he had requested to let him ride. The car on which these men were riding was lent to Tackett for the use of all the men who cared to ride on it, and although Tackett secured permission to use the car, in using it he was not acting as a superior agent or servant of the company, nor was the company responsible to the other men for his personal acts of negligence. The case would be the same if Bridgman had been injured by the personal negligence of some other man riding on the car, because Tackett was not a superior officer of Bridgman, or other than a co-laborer with him as he had been during the day, although the car was put in his charge, as he had requested its use.

The rule of liability in this class of cases must rest on the ground that the company furnishes, or sets apart, for the use of its employes, the way or the means, whichever is used, and the injury must have been caused by some defect in the way or means, or caused by the negligence of some servant of the company acting at the time under its direction or within the scope of his employment. For example, as the company had furnished or set apart this means of transportation for the use and convenience of Bridgman, if he had been injured by a defect in the track or by the unsafe condition of the hand-car, liability would attach to the company. And so if, while using the means that had been so furnished or set apart for his use, his injury had been caused by some agent or servant of the company acting under its direction or within the scope of his employment, the company would be liable.

But the evidence does not bring this case within the scope of this rule, nor does it bring it within the scope of the averments of the petition which stated a good cause of action. To extend the duty of the master to furnish protection to employes under the circumstances of this case would go far beyond the limits of any case within our knowledge and would subject the company to liability in any case in which it furnished a hand-car or other car to its employes for their accommodation and convenience, and one of them while using the car was injured by the personal negligence of a co-laborer riding on the same car.

It results from the foregoing view that the motion for a peremptory instruction should have been sustained. Wherefore, the judgment is reversed, with direction for a new trial consistent with this opinion; and if there is another trial and the evidence is substantially the same as appears in this record, the court should order a directed verdict.